**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

_____

SCOTT LEWEY,

                      Plaintiff,

        vs.

BITTERROOT TIMBERFRAMES, L.L.C.,
BITTERROOT BUILDERS OF BIG SKY, INC.,
THE BITTERROOT GROUP, GREEN MOUNTAIN
CONSTRUCTION LLC, and BRETT MAURI,

                Defendants.

_____

CAUSE NO. CV 05-87-M-DWM

FINDINGS AND RECOMMENDATION
OF UNITED STATES
MAGISTRATE JUDGE

This matter comes before the Court on Plaintiff Scott Lewey's Motion for Summary Judgment, and Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment.  Upon consideration of the briefs and materials of record, the Court enters the following:

**RECOMMENDATION**

**IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Dkt. # 36) be **DENIED**, and Defendants' Motion to Dismiss, or Alternatively, for Summary Judgment (Dkt. # 37) be **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Defendants' motion should be granted to the extent they seek summary judgment

ORDER - PAGE 1

with respect to Plaintiff's claim for relief under ERISA, but should be denied in all other respects.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of the United States Magistrate upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to these findings must be filed with the Clerk of Court and copies served on opposing counsel within ten (10) days after receipt hereof, or objection is waived.

DATED this 10th day of August, 2006.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

## MEMORANDUM

### I.    Introduction

Plaintiff Scott Lewey worked for the various Defendant entities (hereafter "the Bitterroot Companies") for a period of nearly four years - from October 2000 until August 2004.[1]  During this time period, Lewey and the Bitterroot Companies had an oral agreement whereby a portion of the income or wages to which Lewey

---

[1] The Defendants are all affiliated entities.  Defendant Brett Mauri was the Chief Executive and Operating Officer of at least two of the Defendant entities during the pertinent time period (Bitterroot Timberframes, LLC, and Bitterroot Builders of Big Sky, Inc.) Initially Lewey operated as a subcontractor for one of the entities (Bitterroot Timberframes, LLC), but later became an employee of the various entities for which he worked.

was entitled was deferred and held by the Bitterroot Companies. While the parties dispute the purpose and amount of the "deferred income account," there exists no dispute that an agreement existed whereby a portion of Lewey's income or wages was deferred.  Lewey has initiated this action claiming the Bitterroot Companies have, since the date he terminated his employment, wrongfully failed to pay him the amounts of money to which he is entitled under the deferred income agreement.

Lewey has advanced two claims for relief.  First, Lewey contends the deferred income agreement constituted an employee benefit plan within the meaning of ERISA.[2]  Accordingly, Lewey asserts the conduct of the Bitterroot Companies constitutes a breach of their fiduciary obligations, entitling Lewey to the remedies provided by ERISA.  Second, Lewey asserts, in the alternative, that the conduct of the Bitterroot Companies constitutes a breach of contract under Montana law.

Lewey invokes federal question jurisdiction pursuant to the specific jurisdictional grant over ERISA claims provided by 29 U.S.C. § 1132(e), as well as the general federal question jurisdiction statute, 28 U.S.C. § 1331.  Supplemental jurisdiction over the state law contract claim is invoked pursuant to 28 U.S.C. § 1367.

---

[2] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

The matter is presently before the court on cross-motions of the parties.  Lewey seeks summary judgment, pursuant to Fed. R. Civ. P. 56, on his ERISA claim.[3]  The Bitterroot Companies, in turn, move for summary judgment upon the ERISA claim, and at the same time, request the Court to decline exercising supplemental jurisdiction under 28 U.S.C. § 1367 over Lewey's state law contract claim.[4]

## II.  Jurisdictional Analysis

By way of 28 U.S.C. § 1331, "Congress has broadly authorized the federal courts to exercise subject-matter jurisdiction over 'all civil actions arising under the Constitution, laws, or treaties of the United States.'" *Arbaugh,* 126 S.Ct. at 1238. Additionally, ERISA contains its own jurisdiction-conferring provision found at 29 U.S.C. 1132(e), which grants federal courts

---

[3] Lewey's motion is addressed solely to the ERISA claim and does not seek summary judgment, in the alternative, upon the state law contract claim.  The Bitterroot Companies, in turn, have filed a motion which addresses only the ERISA claim, and do not seek judgment, in the alternative, upon his state claim for breach of contract.

[4] The Bitterroot Companies' motion is styled as a motion to dismiss for lack of subject matter jurisdiction, or alternatively, motion for summary judgment for lack of subject matter jurisdiction.  For the reasons detailed below, the motion is properly treated as a motion for summary judgment upon the Bitterroot Companies' defense of failure to state a claim upon which relief can be granted.  *See* Rule 12(h)(2), Fed. R. Civ. P.; *Arbaugh v. Y&H Corporation,* 126 S.Ct. 1235, 1242 (2006)(discussing the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy").  The Bitterroot Companies' challenge to Lewey's ERISA claim is a merit-based challenge, not a subject matter jurisdiction challenge.

jurisdiction over actions for benefits allegedly due under an ERISA-covered plan and for breach of fiduciary duty by plan fiduciaries.  *See Scott v. Gulf Oil Corp.*, 754 F.2d 1449, 1501 (9th Cir. 1985).  As previously noted, Lewey invokes the subject-matter jurisdiction of this Court under both of these statutory grants of jurisdiction by asserting the deferred income agreement extant between he and the Bitterroot Companies is an employee benefit plan falling within the purview of ERISA.

The crux of the Bitterroot Companies' motion is that the deferred income agreement is not an ERISA plan.  Accordingly, the Bitterroot Companies argue subject-matter jurisdiction over the controversy is lacking and the action must be dismissed in its entirety.  In short, the Bitterroot Companies contend that the existence of an ERISA-governed plan is an essential precursor to federal jurisdiction.  *See Kulinski v. Medtronic Bio-Medicus Inc.,* 21 F.3d 254, 256 (8th Cir. 1994)(where the evidence "fails to establish the existence of an ERISA plan, the claim must be dismissed for lack of subject-matter jurisdiction.").

The Bitterroot Companies' motion, as framed, calls upon the Court to address the "subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy" and thereby avoid another of the so-called "drive-by jurisdictional rulings." *Arbaugh*, 126 S.Ct. at 1242 (citation omitted).  In this regard "[s]ubject matter jurisdiction in federal-question cases is sometimes erroneously

conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief - a merits-related determination." *Arbaugh*, 126 S.Ct. at 1242 (citation omitted).  Subject matter jurisdiction is not defeated because the possibility exists that the averments might fail to state a cause of action. "Rather, the district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another...unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89, 118 S.Ct. 1003, 1010 (1998) (citations omitted). Consequently, where a plaintiff fails to allege or ultimately prove facts upon which relief can be granted, the court should dismiss on the merits, not for lack of subject-matter jurisdiction.  *See Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 951 (9th Cir. 2000); *DaSilva v. Kinsho Int'l. Corp.,* 229 F.3d 358, 361-66 (2nd Cir. 2000).  The three consequences of properly "typing" a factual requirement imposed by federal statute as "jurisdictional" or relating to the "merits" were detailed by the Court in *Arbaugh*: (1) subject-matter jurisdiction can never be forfeited or waived; (2) the

trial judge may resolve contested facts relating to subject-matter jurisdiction while the trier of fact must resolve contested facts relating to the merits of a claim; (3) if the court lacks subject-matter jurisdiction it must dismiss the complaint in its entirety and may not exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 over pendent state-law claims  126 S.Ct. at 1244-45.

In the present case, the determinative inquiry is whether the Court must treat the existence or non-existence of an ERISA plan as going to the merits of Lewey's claim or to the subject-matter jurisdiction of the Court.  Because the Court finds, as detailed below, the "deferred income agreement" at issue does not qualify as an ERISA plan, the important consequence of properly typing this fact issue as jurisdictional or merit-based bears directly upon whether this Court may proceed to exercise supplemental jurisdiction over Lewey's state contract claim pursuant to 28 U.S.C. § 1367.[5]  *Arbaugh*, 126 S.Ct. at 1244-45.

Prior to *Arbaugh* (a case involving the employee-numerosity requirement of Title VII), some courts had concluded that "[w]here federal subject matter jurisdiction is based on ERISA, but the evidence fails to establish the existence of an ERISA

---

[5] "The existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Kanne v. Connecticut General Life Ins. Co.*, 867 F.2d 489, 492 (9th Cir. 1988), cert denied 492 U.S. 906 (1989).

plan, the claim must be dismissed for lack of subject matter jurisdiction." *Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994)(citing cases which viewed the question of whether an ERISA plan existed as "jurisdictional").  Other courts, however, concluded the existence or non-existence of an ERISA plan goes to the merits of the claim rather than to the jurisdiction of the court.  21 F.3d at 256, *citing Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees*, 974 F.2d 391, 397-98 (3rd Cir. 1992); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 573 (5th Cir. 1980).  The Ninth Circuit has appeared to treat the issue as jurisdictional in nature: "The existence of an ERISA plan and the alleged occurrence of breaches of fiduciary duty are factual determinations necessary to establish both the merits of a claim and ERISA jurisdiction that are properly resolved under the summary judgment standard." *Steen v. John Hancock Mut. Life Ins. Co.,* 106 F.3d 904, 910 (9th Cir. 1997).  Considering the rationale expressed in *Arbaugh* relative to resolution of the subject-matter jurisdiction/ingredient-of-claim-for-relief dichotomy, there appears to be little doubt that the existence or non-existence of an ERISA plan is properly considered as an element of a plaintiff's claim for relief, not a jurisdictional issue.  *See e.g.*, *Cobb v. Contract Transport*, *Inc.* 452 F.3d 543, 550 (6th Cir. 2006)*.*

ORDER - PAGE 8

"A plaintiff properly invokes Section 1331 jurisdiction when [he] pleads a colorable claim 'arising under' the Constitution or laws of the United States." *Arbaugh*, 126 S.Ct. at 1244, *citing Bell v. Hood*, 327 U.S. 678, 681-85 (1946).  A claim is to be considered as not colorable only if it is "immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous."  *Bell*, 327 U.S. at 682-83.  Under the circumstances of the present case, it cannot be said that Lewey's claim under ERISA was not "colorable."  *See e.g.*, *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 519 (6th Cir. 2006). Rather, Lewey legitimately invoked federal question jurisdiction to place before the Court the question of whether, applying the pertinent provisions of ERISA, the "deferred income agreement" should be considered an ERISA-plan.  The fact that Lewey failed to sustain his burden in establishing the existence of an ERISA-plan does not translate into the conclusion that the Court was without the jurisdictional authority to resolve the issue. Instead, Lewey's failure to sustain his burden goes directly to the merits of his claim.  Therefore, the Bitterroot Companies' motion is necessarily treated as a motion for summary judgment upon the Companies' defense that Lewey has failed to state a claim upon which relief can be granted under ERISA.[6]

---

[6] *See,* Rule 12(h)(2), Fed. R. Civ. P.

ORDER - PAGE 9

The fact the Court concludes Lewey has failed to establish an essential element of his ERISA claim which entitles the Bitterroot Companies to summary judgment upon that claim does not mean the Court is constrained to dismiss the action in its entirety. *Arbaugh*, 126 S.Ct. at 1244-45.  Rather, the Court retains discretion to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Lewey's pendent state-law contract claim.  126 S.Ct. at 1244-45.

Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise jurisdiction over a state claim if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or; (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.  These identified categories provide the primary basis for a district court's discretion to decline supplemental jurisdiction. *Executive Software North America Inc. v. United States District Court,* 24 F.3d 1545, 1555-56 (9th Cir. 1994).  Once a court identifies a factual predicate which corresponds to one of the Section 1367(c) categories, the exercise of discretion "is informed by whether remanding the pending state claims comports with the underlying objective of most sensibly accommodating the value of economy, convenience,

fairness, and comity." *Executive Software,* 24 F.3d at 1557 (internal citations and quotations omitted).

In the present case, Section 1367(c)(3) would provide the basis upon which the Court could, in the exercise of its discretion, decline to exercise supplemental jurisdiction over Lewey's state-law based contract claim.  This decision, however, must be informed by whether declining jurisdiction at this juncture would accommodate the "values of economy, convenience, fairness and comity." *Executive Software*, 24 F.3d 1557.  Deciding whether or not exercise supplemental jurisdiction "is a responsibility that district courts are duty-bound to take seriously." *Acri v. Varian Associates, Inc.,* 114 F.3d 999, 1001 (9th Cir. 1997) (en banc).

Under the circumstances of this case, judicial economy, convenience, and fairness to the parties would best be served by this Court exercising supplemental jurisdiction over Lewey's state-law based breach of contract claim.  This case, which was filed on May 23, 2005, has been actively litigated for more than a year.  Cross-motions for summary judgment have been filed which impact upon both of the claims advanced by Lewey and the matter is presently scheduled for a non-jury trial on August 28, 2006.  The dismissal of Lewey's state claim at this juncture would not only fail to serve judicial economy but result in a squandering of the judicial resources which have been expended by this Court.

Moreover, the Bitterroot Companies chose not to present their jurisdictional challenge until this matter proceeded entirely through the pretrial process.  The Court finds it would be extremely unfair to Lewey to dismiss his state-law based claim, thereby relegating him to "starting over" in state court.  The issues remaining for resolution are not complex and can be resolved by this Court and can be resolved with the expenditure of a modicum of judicial resources.

**III.  Discussion**

    A.  <u>The "Deferred Income Agreement" is not an ERISA Plan</u>

        (i.) *Factual Background*

Lewey's relationship with the Bitterroot Companies first began on October 1, 2000, when Lewey began operating as a subcontractor for Defendant Bitterroot Timberframes, LLC, ("Timberframes").  Lewey operated as a subcontractor for Timberframes during the period of October 1, 2000, through August 13, 2001.  After a short hiatus, Lewey returned to work as an employee of Timberframes from January 4, 2002, through December 31, 2002.  Beginning on January 1, 2003, and continuing through June 2004, Lewey worked as an employee of Defendant Green Mountain Construction Company, LLC.  From June 2004, until August 6, 2004, Lewey worked as an employee of Defendant Bitterroot Builders of Big Sky, Inc. ("Builders") at which time Lewey terminated his employment.

During the pertinent period of time, Defendant Brett Mauri was the Chief Executive and Operating Officer of Timberframes and Builders.  The present controversy has its genesis in an oral agreement loosely entered between Lewey and Mauri in early 2001 when Lewey was operating as a subcontractor for Timberframes.  At that time, Lewey approached Mauri in the Timberframes parking lot and asked what it would take "to become a partner in the business."[7]  Mauri told Lewey that a portion of Lewey's compensation could be withheld and paid into a "deferred income account," with the understanding that the money might eventually be exchanged for equity in the company.[8]  Sometime around February 9, 2001, after Lewey advised Mauri of the amount of his compensation he wished to have withheld, Timberframes began to perform the agreement proposed by Mauri by withholding the identified amount from Lewey's compensation.[9]  While Lewey's status with the various Bitterroot Companies changed to that of an employee, the parties continued to perform the agreement by having the identified sum withheld from Lewey's salary.[10]

---

[7] Affidavit of Brett Mauri, ¶ 11 (May 12, 2006).

[8] Mauri Affid., ¶¶ 11-12; Affidavit of Scott Lewey, ¶¶ 9-10 (May 12, 2006).

[9] Mauri Affid., ¶ 14; Lewey Affid., ¶ 9.

[10] Mauri Affid., ¶ 15; Lewey Affid., ¶ 11.

It is undisputed that in performance of the parties' agreement the Bitterroot Companies withheld $111,276.88 from the compensation earned by Lewey between February 2001 and August 2004.[11]  Lewey and Mauri never discussed what would happen to the deferred income if and when Lewey's employment with the Bitterroot Companies ended.[12]  Neither party asserts there was any specific discussion as to how or when the deferred income "might" be exchanged for equity in the companies or how the equity might be valued.  Since Lewey terminated his employment with the Bitterroot Companies on August 3, 2004, Lewey has not received payment of any money from the "deferred income account."[13]

Lewey also asserts that in addition to discussing the fact the deferred income might possibly be used to purchase equity in the Bitterroot Companies, it was understood that the money in the account "would be used for my retirement."[14]  The Bitterroot

---

[11] Lewey Affid., ¶ 11; Defendants' State. of Uncontroverted Fact, ¶¶ 16-18.

[12] Defs.' State. of Uncontroverted Fact, ¶ 25.

[13] Mauri Affid., ¶¶ 15-18; Lewey Affid., ¶ 14. The parties do not agree as to what the value of the account is at present.  The Bitterroot Companies contend that over time Lewey was allowed to "draw" upon the account, thereby reducing the amount held in the account at the time of Lewey's termination.  Mauri Affid., ¶¶ 20-22. Lewey disputes the amount of the draws claimed by the Companies.

[14] Lewey Affid., ¶ 10.

ORDER - PAGE 14

Companies dispute Lewey's assertion that there was any discussion or agreement regarding use of the monies for retirement.[15]  Other than the conclusory statement regarding "retirement," Lewey does not state, or even suggest, that any terms, conditions or other matters relating to retirement were agreed to or even discussed between the parties.

　　　　　(ii.)   *ERISA*

Lewey contends that by entering the "deferred income agreement" the Bitterroot Companies established an "employee pension benefit plan" as defined by 29 U.S.C. § 1002(2)(a).  An "employee pension benefit plan" is defined as "any plan, fund, or program which was....established or maintained by an employer...to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program (i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan, or the method of distributing benefits from the plan."  29 U.S.C. § 1002(2)(A).

"[T]he existence of a written instrument is not a prerequisite to ERISA coverage."  *Scott v. Gulf Oil Corp.*, 754 F.2d 1499, 1503 (9th Cir. 1985).  However, a mere allegation that

---

[15] Mauri Affid., ¶ 16.

ORDER - PAGE 15

an employer provided benefits to its employee does not

automatically invoke ERISA's coverage.  *Id.* at 1504.  The Ninth

Circuit recently discussed its test for determining establishment

of an ERISA plan:

> There are few formal requirements for the creation of
> an ERISA plan.  However, an ERISA plan must invoke an
> "ongoing administrative program," *Fort Halifax Packing Co.
> v. Coyne*, 482 U.S. 1, 12 (1987), and must enable reasonable
> persons to "ascertain the intended benefits, beneficiaries,
> sources of financing, and procedures for receiving
> benefits." *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th
> Cir. 1982) (en banc).
> Very few offers to extend benefits will fail the test
> laid out in *Donovan*, which requires neither formalities nor
> elaborate details.  However, ERISA pertains to "*plans*,
> rather than simply to benefits." *Halifax,* 482 U.S. at 11
> (emphasis in original).  A mere "decision to extend
> benefits," therefore, does not establish a plan within the
> meaning of ERISA.  *Donovan*, 688 F.2d at 1373.  Rather, it is
> axiomatic that a mere offer to extend benefits cannot
> properly be considered a "plan" unless two basic
> requirements are met.  *First, the benefits must be offered
> pursuant to an organized scheme.  Second, the terms of the
> offer, in the context of the relevant surrounding
> circumstances, must enable a reasonable person to discern
> the basic elements of the benefit scheme*.

*Winterrowd v. American General Annuity Ins. Co.*, 321 F.3d 933,

938-39 (9th Cir. 2003) (emphasis added).  Thus, at a minimum, the

facts must show that Lewey's deferred income account was an

"organized scheme" and that the "basic elements" of that scheme

were discernible to a reasonable person.

Assuming all of the facts alleged by Lewey are true, the

Bitterroot Companies are entitled to summary judgment upon the

ERISA claim because Lewey failed to show that the February 2001,

deferred income agreement created an ERISA employee benefit plan.

ORDER – PAGE 16

According to the Bitterroot Companies, Mauri and Lewey never discussed, let alone agreed to any specifics, regarding use of the deferred income account for Lewey's retirement.  In contrast, Lewey maintains that the money in the account would be used for his retirement or might eventually be exchanged for equity in the Bitterroot Companies.  Whether Lewey's retirement was mentioned in the parties' initial conversation regarding the agreement, however, is immaterial.  The evidence demonstrates that the benefits were not "offered pursuant to an organized scheme," and no reasonable person could "discern the basic elements of the benefits scheme."  *See Winterrowd,* 321 F.3d at 939.

In *Winterrowd*, several individuals had worked as commission sales employees at American General Annuity Insurance Company ("AGAIC") when they were notified that the entire workforce would be terminated.  *Id.* At 935-36.  Because they were not salaries employees, they were not eligible for AGAIC Job Security Plan.  Instead, they were offered "a severance package in exchange for remaining on the job until the termination date."  *Id.* at 936.  The letter offering the severance package did not provide the employees with any information about AGAIC's method of calculating the benefits to be received, but they nonetheless accepted AGAIC's offer.  *Id.*

Upon termination, the employees received benefits in accordance with the severance agreement, but they disputed the

method by which their benefits were calculated. *Id.* The employees filed suit for breach of contract, and AGAIC argued the employees' claims were preempted by ERISA. *Id.* AGAIC argued that because it had created a formula for calculating the severance benefits, an ERISA plan was established. According to the Ninth Circuit, however, "the mere decision to calculate benefits does not create a plan if the intended recipients were unable to ascertain the specifics of the formula." *Id.* at 939. The court observed that the letter sent to AGAIC's employees made no reference to a formula for calculating benefits, and was "completely devoid of any basis for [the employees] to confirm that a definite formula existed, or that it had been properly applied." *Id.* The "amorphous system of benefits" extended to the employees was not an "employee benefit plan" within the meaning of ERISA. *Id.*

In the present situation, even if it is assumed that a general reference was made to Lewey's retirement at the time the parties entered the "deferred income agreement," the agreement did not satisfy the two requirements identified by the Ninth Circuit as essential to creating an ERISA plan. First, the deferred income agreement cannot be said to have been "offered pursuant to an organized scheme." Lewey and Mauri simply agreed that a portion of Lewey's compensation would be withheld and that the monies accumulated "might eventually be exchanged for equity

in the company."[16]  Aside from agreeing to the amount of money
that would be withheld periodically from Lewey's compensation,
the parties agree that no other specific details were discussed.

Second, no reasonable person could "discern the basic
elements of the benefits scheme." *Winterrowd*, 321 F.3d at 938-
39.  The elements of an ERISA benefits plan must, at a minimum,
include "the intended benefits, beneficiaries, sources of
financing, and procedures for receiving benefits." *Winterrowd*,
321 F.3d at 939 (quotations omitted).  At most, the only elements
which could be discernable from the deferred income agreement
between Lewey and the Bitterroot Companies are the intended
beneficiary (Lewey) and the source of financing (the amount of
Lewey's reduced compensation).  Reduced to its essence, the
agreement provided nothing more than that the Bitterroot
Companies withhold a portion of Lewey's compensation and maintain
the monies withheld in an account.  Upon Lewey's termination,
there was "nothing for the [Bitterroot Companies] to decide, no
discretion for [them] to exercise, and nothing for [them] to do
but write a check" to Lewey.  *Kolinski*, 21 F.3d at 258.  This
"simple mechanical task" does not require the establishment of an
administrative scheme essential to the existence of an ERISA
plan.  *Id.* at 255.  Because Lewey failed to sustain his burden in
establishing the deferred income agreement constituted a plan

---

[16] Lewey Affid., ¶ 10.

subject to the prescriptions of ERISA, he failed to state a claim for relief under ERISA.  Accordingly, the Bitterroot Companies are entitled to summary judgment, pursuant to Rule 56, Fed. R. Civ. P. upon their defense that Lewey has failed to state a claim for which relief can be granted under ERISA.

    B.   Breach of Contract

    The gravaman of Lewey's pendent state-law based breach of contract claim is that the Bitterroot Companies breached the deferred income agreement by failing to pay Lewey those monies which remained in the deferred income account when he terminated his employment on August 6, 2004.  While neither party specifically requested summary judgment upon the breach of contract claim in their moving papers, both parties presented arguments effectively claiming entitlement to summary judgment upon that claim.  Lewey asserts that "under any theory" he is entitled to recover those monies which remain in the deferred income account.  Plaintiffs' Reply in Support of Motion for Summary Judgment, at 2-4 (June 8, 2006) (Dkt. # 54).  The Bitterroot Companies assert there has been no breach of contract because, according to the Companies, Lewey has receive equity in the Companies in accordance with the terms of the deferred income agreement.  Defendants' Motion to Dismiss and Brief in Support, at 7-8 (May 5, 2006) (Dkt. #37).  Although it is not appropriate to enter summary judgment upon the breach of contract claim at this juncture, it is important to clarify what issues remain for

ORDER - PAGE 20

determination upon this claim based on the undisputed facts of
record.

The undisputed facts, as previously noted, establish the
following: (1) Pursuant to the deferred income agreement, the
Bitterroot Companies withheld $111,276.88 from Lewey's income
during the income of February 2001 through his date of
termination on August 6, 2004.  Lewey Affid., ¶¶ 10-11; Mauri
Affid. ¶¶ 18, 26; (2) From the time of his termination on August
6, 2004, until the present, Lewey has not received any payment of
monies that remained in the deferred income account on the date
of his termination.

A factual dispute exists between the parties regarding
whether the Bitterroot Companies are entitled to an offset
against the $111,276.88 withheld from Lewey's income for monies
purportedly expended by the Bitterroot Companies on Lewey's
"personal needs" during the time frame he worked for the
Companies.  According to the Bitterroot Companies, after the
deferred income agreement was formed, Lewey requested the
Companies to make draws upon the deferred income account as
needed to meet his personal needs such as housing and vehicle
costs.  Mauri Affid., ¶¶ 20-23.  Lewey disputes the amount of the
offsets to which the Bitterroot Companies claim entitlement.
Plaintiff's State. of Genuine Issues (May 12, 2006).

Therefore, the factual issues which remain for trial are:

(1) the amount of money, if any, the Bitterroot Companies are entitled to claim as an offset against the $111,276.88 withheld from Lewey's income;

(2) the amount of pre-judgment interest, if any, to which Lewey is entitled to receive upon the amount of money remaining in the deferred income account on the date of his termination.

Having identified the factual issues which remain for resolution, the Court must address a recently evolved defense which the Bitterroot Companies attempt to assert in opposition to Lewey's breach of contract claim.  From the outset of this litigation, the Bitterroot Companies took the position that a portion of Lewey's income was not deferred in exchange for an interest in the Companies.  In fact, the parties have agreed that the deferred income agreement provided the deferred income might potentially be exchanged for equity in the Bitterroot Companies. That eventuality never came about.  In an effort to hedge their prospects on summary judgment, however, the Bitterroot Companies now suggest there was no breach of contract because Lewey has received equity in the Companies.  Defs.' Mot. to Dismiss and Brief in Support, at 7 (May 5, 2006) (Dkt. # 37).  The Bitterroot Companies' "new" defense is defied by the facts of record and they are precluded from attempting to interject that defense at this stage of the proceedings.

During the course of discovery, Lewey served the following requests for admission upon the Bitterroot Companies:

Request for Admission No. 1: There was an agreement between Scott Lewey and Defendant wherein the parties agreed to

ORDER - PAGE 22

defer a substantial portion of Scott Lewey's income in exchange for an interest in Bitterroot Builders and related companies.

Response: Deny.[17]

By way of a companion interrogatory (Interrogatory No. 1), Lewey requested the Bitterroot Companies to set forth all facts upon which it based its denial to request for admission No. 1. Defendant Mauri provided the following verified response:

There was a verbal discussion that the company would defer a portion of Plaintiff's income as a means to assist him with the claims apparently pending against him by the IRS and in divorce proceedings involving his estranged common law wife. It was further discussed that at some point in the future, these monies being held in the deferred account might be exchanged for equity in the Company based on future valuation and the Plaintiff's continued good standing in the Company.[18]

The Bitterroot Companies' response to Lewey's discovery requests led to the filing of a motion to compel.  In opposing that motion, and referring to Interrogatory No. 1, the Bitterroot Companies advised this Court as follows:

As indicated therein, although it was discussed that the monies being held in this deferred account might be exchanged for equity, this was to have been based on a future evaluation as well as Lewey's continued good standing in the Company.  However, these conditions subsequent never came to fruition given the fact that Lewey eventually resigned his position with Bitterroot Timberframes and thereby discontinued his employment.  In other words, those

---

[17] See, Plaintiff's Mot. for Summary Judgment, Exh. 2.

[18] *Id.*, Interrogatory No. 1.

ORDER – PAGE 23

funds held in the deferred account at Lewey's behest were never converted into any kind of ownership interest.[19]

The Bitterroot Companies' admission that Lewey did not acquire any interest in the Companies stands.  As Lewey accurately notes, the Bitterroot Companies cannot simply disavow their previous position through the mere expediency of adopting a new position purportedly supported by the affidavit of Defendant Mauri which stands in direct contradiction to Mauri's previous sworn statement.  *See e.g., Block v. City of Los Angeles*, 253 F.3d 410, 419 n. 2 (9th Cir. 2001) (*citing Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir. 1975)(a party may not rely on an affidavit contradicting his earlier version of facts to create a disputed fact to avoid summary judgment)).

---

[19] Defendants' Br. in Opposition to Motion to Compel and in Support of Cross-Motion for Protective Order, at 3 (Jan. 5, 2006) (Dkt. # 16).

ORDER - PAGE 24